**Shari Ann BECKER, Plaintiff,**

v.

**Michael J. ASTRUE, Commissioner of Social Security, Defendant.**

**No. 4:08–cv–367 RP–RAW.**

United States District Court,
S.D. Iowa,
Central Division.

Dec. 18, 2009.

Timothy N. Tripp, Tripp, P.C., Pella, IA, for Plaintiff.

Gary L. Hayward, United States Attorney, Des Moines, IA, for Defendant.

## ORDER

ROBERT W. PRATT, Chief Judge.

Plaintiff, Shari Ann Becker, filed a Complaint in this Court on September 12, 2008, seeking review of the Commissioner's decision to deny her claim for Social Security benefits under Title II and Title XVI of the Social Security Act, 42 U.S.C. §§ 401 *et seq.* and 1381 *et seq.* This Court may review a final decision by the Commissioner. 42 U.S.C. § 405(g).

Plaintiff filed her application for benefits on December 7, 2005. Tr. at 77–79. Plaintiff, whose date of birth is October 30, 1976 (Tr. at 77), was 31 years old at the time of the hearing on March 5, 2008. After the applications were denied, initially and on reconsideration, Plaintiff requested a hearing before an Administrative Law Judge. The hearing was held before Administrative Law Judge Denzel R. Busick (ALJ). Tr. at 725–68. The ALJ issued a Notice Of Decision—Partially Favorable on November 27, 2007. Tr. at 17–33. The Appeals Council declined to review the ALJ's decision on July 15, 2008. Tr. at 10–12. Thereafter, Plaintiff commenced this action.

In her application, Plaintiff said she became unable to work January 18, 2005. Tr. at 77. The ALJ proceeded through the steps of the sequential evaluation, finding that Plaintiff has not engaged in substantial gainful activity since the alleged onset of disability. He found that Plaintiff's primary severe impairment is Crohn's disease, and that she has secondary impairments of dysthymia and a history of substance abuse in partial if not full remission. The ALJ found that Plaintiff's impairments do not meet or equal any listed in the regulations. The ALJ found:

> After careful consideration of the entire record, the undersigned finds that, from January 18, 2005, until May 12, 2006, the claimant's residual functional capacity was reduced below the level necessary for sustained work in competitive employment. She was able to do light exertional activities of an unskilled nature but she could not have performed the work without frequent, unscheduled periods away from her work station, 5 to 6 times a day more than normal, for up to 10 minutes at a time and as much as 2 to 3 days a week.

Tr. at 26. The ALJ went on to find that on May 12, 2006, medical improvement occurred (Tr. at 27), and that, thereafter, Plaintiff was able to engage in substantial gainful activity at a light exertional level. Tr. at 32.

## MEDICAL EVIDENCE

Plaintiff was a patient at Iowa Methodist Medical Center in Des Moines, Iowa from January 25 until February 9, 2005 with her first bout of Crohn's disease. During the hospitalization, she underwent laparoscopic ileocecectomy. Tr. at 181.

Joel Hade, M.D., a gastroenterologist, one of Plaintiff's treating physicians, wrote a series of letters stating that Plaintiff would have been able to return to work six weeks after her discharge from the hospital, about April 4. Tr. at 244, 245 & 246. On April 4, 2005, Dr. Hade wrote to Plaintiff's primary care physician, Susan Donahue, D.O.. The doctor noted that Plaintiff looked healthy and was afebrile. However, Plaintiff reported that she was not eating well, and was nauseated a good deal of the time. Tr. at 249. May 11, 2005, Plaintiff underwent upper GI and small bowel x-ray which Dr. Hade stated looked totally normal with no evident recurrence of Crohn's disease. Tr. at 247. On August 28, 2005, Dr. Hade wrote that Plaintiff had reported that she was unable to continue under his care because of a lack of health insurance. Dr. Hade told Dr. Donahue that Plaintiff's disease was likely to recur in the future. He said that if he could be of help, Dr. Donahue should call on him. Tr. at 243.

On August 29, 2005, Plaintiff was hospitalized at Iowa Methodist Medical Center after an overdose of medication followed by inhaling crystal meth. Her boy friend took her to the hospital where she underwent gastric lavage and was treated with activated charcoal. Tr. at 260. Plaintiff told the doctors that she had taken the medication because she was in pain, and had not intended to harm herself. Tr. at 260. The next morning it was determined that Plaintiff was not at risk for suicide, so she was discharged. Tr. at 261.

On November 17, 2005, Plaintiff was seen at Broadlawns Medical Center in Des Moines, complaining of lightheadedness which had been going on for a few days. The previous day, she had fallen to the floor. Tr. at 449. Plaintiff was in the hospital until the 19th. Tr. at 450.

On January 9, 2006, Plaintiff was seen at the University of Iowa Hospitals and Clinics—Gastroenterology. At the time of the visit, Plaintiff weighed 119 pounds. She complained of intermittent nausea, vomiting and pain in her right lower quadrant. Tr. at 288. After a physical examination, Jeffrey Field, M.D., stated that he would be aggressive in his evaluation. His plan included an abdominal/pelvic CT to ensure that Plaintiff did not have an abscess or lymphadenopathy. Next, he planned a colonoscopy. Treatment would depend on what was found. Tr. at 289. The colonoscopy on January 18, 2006, showed very active Crohn's disease of the neoterminal ileum and mild disease of the colon. Tr. at 286 & 522. See also radiological small bowel series at Tr. at 525. When Plaintiff was seen on February 6, 2006, she was holding her right lower abdomen because of pain. The doctor proceeded with the CT to rule out evidence of abscess. Tr. at 284. The CT findings were consistent with active Crohn's in the distal ileum, and worrisome for Crohn's in the proximal ascending colon. There was no evidence of abscess. Tr. at 291.

On February 9, 2006, psychiatrist, Timothy P. Olson, M.D., sent copies of his treatment records for the record in this case. Tr. at 295–304. In his cover letter, Dr. Olson opined that Plaintiff did not have significant limitations from her dysthymic disorder or mixed substance abuse in remission. He said that these illnesses "are under relatively good control." Tr. at 295.

When Plaintiff was seen at the University on February 21, 2006, Elizabeth A. Cooper, P.A.C. diagnosed significantly active Crohn's disease of the neoterminal ileum and mild disease of the colon, refractory to oral prednisone with worsening RLQ abdominal pain. Plaintiff was treated with an infusion of Remicade which was to be repeated in 4 weeks. Tr. at 520.

When Plaintiff was seen at the University on March 23, 2006, she reported that

the right lower quadrant abdominal pain was still present, but tolerable and had not worsened. Plaintiff denied current fevers. She also reported that with the Remicade, her bowel movements had decreased in frequency and were beginning to occasionally firm. Plaintiff said she continued to vomit four times a day, but she attributed this to being pregnant. Tr. at 517. The diagnoses were significantly active Crohn's disease with worsening right lower quadrant pain and newly discovered pregnancy, 8 weeks' gestation. She was given another infusion of Remicade, and an injection of B12. She was going to establish care with a high-risk OB/GYN physician. Tr. at 518.

On April 13, 2006, Plaintiff was diagnosed with pregnancy of 12 weeks by Amy Dawes, PA–C at Perinatal Center of Iowa, in Des Moines. Tr. at 340.

The ALJ found that Plaintiff was no longer disabled after May 12, 2006. Tr. at 27.

On May 12, 2006, Plaintiff was seen by Ms. Cooper at the University. Plaintiff reported "significant improvement in her right lower quadrant abdominal pain and decreased frequency of her stools with improved consistency." Plaintiff's pregnancy was progressing as expected without concern for pre-term labor. Tr. at 514. Because there were "signs of improvement," Plaintiff's medications were continued as previously prescribed. Plaintiff was given another dose of Remicade and an injection of B12. Tr. at 515. Plaintiff was admitted to Mercy Hospital on the night of May 21, 2006 with complaints of cramping/contractions. Plaintiff reported that her Crohn's disease had been relatively stable with diarrhea, which was normal for her. Tr. at 530. On June 19, 2006, Ms. Cooper wrote to Plaintiff that blood work from the previous week showed improvement in white blood cell count and hemoglobin from the week before. Tr. at 513. On June 26,

2006, Plaintiff continued to make improvement, and any discomfort she reported seemed to be attributable to her pregnancy. She was given repeat infusion of Remicade and an injection of B12. Tr. at 510–11.

On July 10, 2006, Plaintiff was admitted to Mercy Hospital and discharged on the 17th. She had fallen in her bathroom and was brought to the hospital by ambulance. Plaintiff said that although she was compliant with her medication, the Crohn's symptoms had recently gotten worse. Tr. at 542. Joseph Hwang, M.D. wrote that Plaintiff fell, "presumably secondary to dehydration." Although there was no sign of severe dehydration, he ordered intravenous fluids. Tr. at 544. On July 13, 2006, Plaintiff underwent a esophagogastroduodenoscopy by Harvey Giller, D.O., which was normal. Tr. at 495. Dr. Giller wrote that Plaintiff had come to Mercy Hospital to seek treatment because abdominal discomfort in the right lower quadrant and nausea, vomiting, and loose stools. Under the heading past medical history, it was noted that Plaintiff had undergone anterior cruciate ligament to her right knee. Under review of systems, it was noted that Plaintiff was positive for fever, chills, cough, joint pain, weakness and headaches as well as depression and anxiety. Tr. at 496. After his examination, Dr. Giller continued Plaintiff's medications and would await stool cultures. Tr. at 498. On the 15th, Plaintiff saw John Larson, M.D. because she had requested to discharge against medical advise. Dr. Larson noted that Plaintiff's history included three psychiatric hospitalizations for depression. Tr. at 549. Plaintiff told the doctor that once, while she was in prison, she had been given Haloperidol which caused a dystonic reaction. During her pregnancy, there had been an effort to minimize psychotropic medications. Tr. at 550. After talking

to Dr. Larson, Plaintiff agreed to remain in the hospital. Tr. at 551.

When Plaintiff was seen on July 31, 2006, at the University, she reported that on July 8 or 9, she experienced significant nausea, vomiting and diarrhea and that she had been taken by ambulance to Mercy Hospital in Des Moines where she was treated for 7 days. Tr. at 508. Dr. Field gave Plaintiff a prescription for Remicade to be given by Home Health Care because Plaintiff had been advised to remain on complete bed rest. Tr. at 509.

On August 15, 2006, Plaintiff telephoned Dr. Field to report that she had her Remicade treatment locally as prescribed. Tr. at 507. On September 7, 2006, Plaintiff's report of lab work notes that Plaintiff's blood sugar was 104. Tr. at 506. A lab report dated September 15, 2006 noted Plaintiff's blood sugar was 48, and that a normal range is 70–110. Tr. at 503. On September 15, 2006, Plaintiff's home care nurse called Elizabeth Cooper at the University to report that Plaintiff's blood sugar was low at 25. It was noted that Plaintiff was "still on the CVN (central venous nutrient)." After Dr. Field was consulted, Plaintiff was advised to go to an emergency room. Tr. at 504.

On August 31, 2006, Plaintiff was admitted to Mercy Hospital to be treated for pre-term labor under the care of Neil Mandsager, M.D. Tr. at 565–69. Plaintiff was discharged September 2, 2006. Tr. at 566. On September 14, 2006, Plaintiff went to the emergency room for hypoglycemia. She was admitted and was discharged on the 19th. Tr. at 570–95. During this hospitalization it was decided to induce labor on September 24, 2006. Tr. at 576. Plaintiff gave birth to a baby girl on September 25, 2006. Tr. at 600.

On October 25, 2006, Dr. Fields submitted a residual functional capacity statement. Tr. at 607–11. The doctor identified Plaintiff's symptoms as chronic diarrhea, abdominal pain and cramping, fever, loss of appetite, vomiting, malaise, and fatigue. He wrote that Plaintiff has chronic right lower quadrant pain. Tr. at 607. The doctor indicated that the severity of Plaintiff's symptoms will frequently interfere with attention and concentration. Tr. at 608. Doctor Fields concluded the form by writing: "This woman's Crohn's disease is debilitating her and I'm not convinced she could ever hold or sustain a "normal" job i.e. 8–5 whether sitting or standing." Tr. at 611.

Plaintiff was admitted to Iowa Methodist Medical Center December 20–21, 2006 because of nausea, vomiting and right lower quadrant pain. Tr. at 651. During the hospitalization, Plaintiff had an episode of acute delirium. Lorazepam and levsin were found in her room, but both medications had been prescribed by her doctors. Plaintiff left the hospital against medical advice. Tr. at 652. A radiology report of a gastrointestinal small bowel study, dated December 21, 2006, showed a normal esophagus and stomach, and an irregularity of a loop of distal ileum which was thought to represent chronic scarring. Tr. at 664–65.

On March 16, 2007, Plaintiff submitted a residual functional capacity assessment form completed by Ed Friedman, P.A., and counter signed by Ronald McHose, D.O. Tr. at 669–74. Mr. Friedman was noted to be Plaintiff's care giver in several other medical records. See, e.g. Tr. at 284. Mr. Friedman wrote that he had seen Plaintiff monthly for medical care, and had known her since childhood. He wrote that Plaintiff's symptoms included chronic diarrhea, abdominal pain and cramping, episodic fever, vomiting, malaise, and fatigue. Describing Plaintiff's pain, Mr. Friedman wrote: "Right lower quadrant abdominal pain, constant with episodes of increasing intensity which are

so severe as to disable her for activities of daily living including caring for new born baby. Stress increases pain." Tr. at 670. Mr. Friedman wrote that the medications prescribed for Plaintiff cause drowsiness and dizziness. On a scale of "never," "seldom," "often," "frequently," "constantly," he said that Plaintiff "often" experiences pain or other symptoms severe enough to interfere with attention and concentration. Mr. Friedman opined that Plaintiff is incapable of even low stress jobs. Tr. at 671. Mr. Friedman also opined that Plaintiff is able to sit and stand/walk less than 2 hours of an 8 hour day. Tr. at 672. He opined that Plaintiff "sometimes needs to lie down or rest at unpredictable intervals during an 8 hour work day." He indicated that Plaintiff can occasionally lift 20 pounds. Tr. 673. Mr. Friedman opined that if Plaintiff were working, she would likely be absent from work more than four days per month. The final question on the form was if Plaintiff suffers from any other limitations on the ability to work, to which he responded "Anxiety." Tr. at 674.

Plaintiff was seen at the University on March 19, 2007. Tr. at 718–21. Plaintiff reported that she continued to experience diarrhea, nausea, and emesis[1] although significantly improved since she gave birth. She said that the emesis could be without warning. Tr. at 718. On physical examination, Plaintiff appeared tired. It was noted that a recent colonoscopy revealed significant improvement in the Crohn's inflamation. Tr. at 719. After the visit, Ms Cooper, from the University, wrote to Plaintiff to tell her that based on lab work which showed improvement, she was advised to stop taking iron supplements until her next visit. Tr. at 722.

When Plaintiff was seen at the University on April 30, 2007, it was noted that a colonoscopy in February 2007, "demonstrat[ed] significant improvement of inflamation." Nevertheless, Plaintiff appeared not to be in good spirits. She was not feeling well and she was worn down. She reported running a low grade fever the last week. Plaintiff reported 4–5 loose stools per day and nausea and emesis a couple times per day without warning. After a Remicade treatment, she said she felt as though she had been run over by a truck, but denied flu like symptoms or joint pain. Tr. at 714.

On May 15, 2007, Plaintiff underwent a small bowel series of x-rays. The study showed no radiographic evidence of active Crohn's disease. Tr. at 713.

When Plaintiff was seen at the University on June 18, 2007, she appeared in better spirits, and reported that she "almost felt good," but she reported that she still had 8–10 watery bowel movements per day. She said that her abdominal pain continued on and off, but in general it had improved. "[S]he has developed episodes of 'spasms' and cramps for the last 2½ months, in which her foot and her hand may lock. She is now using Requip for restless legs with benefit." Tr. at 702. Under the heading "Impression," Ms. Cooper wrote:

> Thirty year old woman with Crohn's disease being treated with azathioprine, Pentasa, and infliximab. Recent colonoscopy reveals significant improvement in Crohn's inflammation. She continues with RLQ abdominal pain which is slowly improving. She continues with significant nausea and vomiting improved with Reglan. However she is developing what sounds like a dystonic reaction. Diarrhea continues.

Tr. at 703.

On July 1, 2007, Ms. Cooper wrote to Plaintiff that a study showed that her

---

1. vomiting. Stedman's Medical Dictionary.

stools did not show evidence of infection causing the diarrhea. Tr. at 701.

Plaintiff was admitted to Iowa Methodist Medical Center on July 18, and discharged July 25, 2007. On admission, she complained of right lower quadrant pain with diarrhea and transient fevers for the previous six days. She had been vomiting for two days, and could not hold down any food or fluids. Tr. at 677. Plaintiff was treated with IV medication and her labs were monitored. On discharge, her status was "improved and stable." Tr. at 678.

### HEARING TESTIMONY

Plaintiff testified under oath at an administrative hearing on March 5, 2007. Tr. at 725–68. In response to questions from the ALJ, she testified that she can be on her feet, standing or walking, for about an hour; that she has no problem sitting; that she can lift her daughter who weighs 14 pounds; that she has no problem bending at the waist; that she has no problems with her knees; and, that she can use her arms and hands. Tr. at 750. Plaintiff testified that she can go to the grocery store by herself if she only has a few items to buy, but that when she does more substantial shopping she has someone go with her to do the lifting. Tr. at 751. She testified that her medications cause her to be drowsy and make it difficult for her to think. She said that one of the drugs she takes for Crohn's is an immune suppressor, so any time she gets a cold, she is more ill than would normally be expected. Tr. at 752.

Plaintiff testified that her primary physicians are Dr. Field for the Crohn's, and that Mr. Friedman is her family health care provider. The ALJ asked Plaintiff what Dr. Fields told her about the prognosis of the Crohn's, to which she responded:

> From what he's told me, I don't know what it means medically, he's told me that my prognosis is guarded. My lab

work, he uses the words, it's stable. He never says, good; never says, improving. He usually uses the word, stable, or guarded. So, medically, I don't know. Tr. at 756. She said that Dr. Fields told her she would need to be on medications the rest of her life.

The ALJ asked Plaintiff about her need to use the rest room. She said she had good and bad days, with bad days coming, on average, three times a week. "On a bad day, I've been in the rest room as much as three times in an hour for bowel movements.... On a good day, I can go three or four hours without having ..." Tr. at 757. She told the ALJ that she has very little warning of the need to use a rest room: "I've actually soiled myself because I couldn't get there in time." She said that its very difficult for her to distinguish between the normal stomach trouble and cramps she feels and the need to get to a rest room. "I've thought I had gas, and it—like I said, I've not made it to the rest room in time." Tr. at 758.

After Plaintiff testified, the ALJ called Elizabeth Albrecht to testify as a vocational expert. Tr. at 760. The ALJ asked the vocational expert to assume: ... a hypothetical individual who may be able to work at a light level of work such that they could pick up 20 pounds on occasion, 10 pounds or less frequently; assume that they should be able to sit or—sit six hours of an eight-hour workday, stand and walk combined about six hours; need normal work breaks; no limitation in the operation of hand controls. Assume that there are no major postural limitations, manipulation limitations, visual limitations, communication limitations, or environmental limitations. Assume however, that the person, at all times, would have at least mild limits on their activities of daily living and their social functioning; moderate limits on their concentration, persistence, and

pace such that they would be moderately limited in the ability to carry out details; moderately limited in the ability to maintain extended concentration. Tr. at 763. In response, the vocational expert testified that such an individual could do Plaintiff's past relevant work as a fast food worker. If such a person would need to take rest room breaks five or six times a day for five to ten minutes at a time, competitive work would be precluded. Tr. at 764. However, if the episodes only occurred two to three days a week, competitive work would still be possible, according to the vocational expert. Tr. at 765. On cross examination, the vocational expert testified that the necessity to miss two to three days of work each month on a consistent basis would also preclude competitive work. She also testified that if pain and other symptoms caused the individual to work at a slow pace, as per Tr. at 608, competitive work is precluded. Tr. at 766.

## DISCUSSION

■ We will affirm the ALJ's decision "[i]f the ALJ's findings are supported by substantial evidence on the record as a whole," an inquiry that requires us to consider evidence in the record that detracts from the ALJ's decision. *Wagner v. Astrue*, 499 F.3d 842, 848 (8th Cir. 2007). "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the decision." *Reutter ex rel. Reutter v. Barnhart*, 372 F.3d 946, 950 (8th Cir.2004).

We will not reverse the ALJ's "denial of benefits so long as the ALJ's decision falls within the 'available zone of choice.'" (*Bradley v. Astrue*, 528 F.3d 1113, 1115 (8th Cir.2008)). The decision of the ALJ "is not outside the 'zone of choice' simply because we might have reached a different conclusion had we been the initial finder of fact." *Id.* (quoting *Nicola [v. Astrue]*, 480 F.3d

[885] at 886 [ (8th Cir.2007) ] ). Rather, "[i]f, after reviewing the record, the court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision." *Goff v. Barnhart*, 421 F.3d 785, 789 (8th Cir.2005). *Owen v. Astrue*, 551 F.3d 792, 798 (8th Cir.2008.) In short, a reviewing court should neither consider a claim de novo, nor abdicate its function to carefully analyze the entire record. *Wilcutts v. Apfel*, 143 F.3d 1134, 1136–37 (8th Cir.1998) citing *Brinker v. Weinberger*, 522 F.2d 13, 16 (8th Cir.1975).

■ The parties agree that the issue in this case is whether the ALJ's finding that medical improvement, such that Plaintiff can return to work, is supported by substantial evidence on the record as a whole. *See* Clerk's documents 16 & 17. The Court is required to search the record for evidence which supports the ALJ's decision as well as the evidence which detracts therefrom. "Thus, the court must also take into consideration the weight of the evidence in the record and apply a balancing test to the evidence which is contradictory." *Gavin v. Heckler*, 811 F.2d 1195, 1199 (8th Cir.1987). The Court will also keep in mind that medical improvement is not sufficient to cease benefits if there is no increase in functional capacity to do basic work activities. *See* 20 C.F.R. § 404.1594(b)(2) & (3). The ALJ found that Plaintiff was disabled from January 18, 2005 until May 12, 2006. Tr. at 32.

On May 12, 2006, Plaintiff reported significant improvement in her abdominal pain and a decreased frequency of stools. On June 19, 2006, improvement in white blood cell count and hemoglobin was reported. A esophagogastroduodenoscopy done on July 12, 2006, was normal. On

March 19, 2007, it was noted that a recent colonoscopy revealed significant improvement in the Crohn's inflamation. Small Bowel x-rays taken on May 15, 2007, showed no radiographic evidence of active Crohn's disease.

On the other hand, on July 10, 2006, when she was admitted to Mercy Hospital, Plaintiff reported that her Crohn's symptoms had recently gotten worse. She was treated for dehydration with intravenous fluids. On admission, she sought treatment for abdominal pain, nausea, vomiting and loose stools. On review of systems, she was positive for fever, chills, cough, joint pain, weakness and headaches as well as depression and anxiety. On July 31, 2006, Plaintiff reported significant nausea, vomiting, and diarrhea.

On October 25, 2006, Dr. Fields rendered his opinion identifying symptoms of chronic diarrhea, abdominal pain and cramping, fever, loss of appetite, vomiting, malaise and fatigue. The doctor opined that Plaintiff's disease is debilitating.

Plaintiff was hospitalized in December 2006 for nausea, vomiting, and abdominal pain.

On March 6, 2007, Ed Friedman, P.A., and Ronald McHose, D.O. noted Plaintiff's symptoms included chronic diarrhea, abdominal pain and cramping, episodic fever, vomiting, malaise and fatigue. The abdominal pain was said to be constant with episodes of increasing intensity which are so severe as to disable her for activities of daily living. It was noted that Plaintiff's medications cause drowsiness and dizziness. Mr. Friedman opined that Plaintiff was incapable of even low stress jobs and that she would likely be absent from work more than four days each month.

When she was seen at the University March 19, 2007, Plaintiff reported that she continued to experience diarrhea, nausea, and emesis. She said the emesis could be without warning. On April 30, 2007, Plain-

tiff appeared to not be in good spirits. She reported a low grade fever and 4–5 loose stools per day along with nausea and emesis. Plaintiff reported that after a Remicade treatment, she felt as though she had been run over by a truck. On June 18, 2007, although Plaintiff reported that she almost felt good, she still had 8–10 watery bowel movements each day. It was also noted that Plaintiff was developing a dystonic reaction to her medication.

On July 18, 2007, Plaintiff was admitted to the hospital with complaints of right lower quadrant pain with diarrhea and transient fevers. She was vomiting and unable to hold down any food or fluids.

Plaintiff testified to her continuing problems due to the Crohn's disease. The vocational expert testified that episodes of diarrhea, as testified to by Plaintiff, would preclude competitive employment. The vocational expert also testified that frequent absences from work also precludes the ability to maintain competitive employment.

■ In the opinion of the Court, when the evidence supporting the ALJ's decision is compared, side by side, to that which detracts therefrom, there is no question that the decision is not supported by substantial evidence on the record as a whole. While there may be medical improvement in Plaintiff's disease, that improvement in not related to her ability to function is a work setting as contemplated by the regulations cited above. This is another case which brings to mind the wisdom set forth in *Rhines v. Harris*, 634 F.2d 1076, 1079 (8th Cir.1980): "Employers are concerned with substantial capacity, psychological stability, and steady attendance ..." Plaintiff's illness has deprived her of substantial capacity and the ability for steady attendance. Although her psychiatrist opined that she is disabled from her physical illness rather than mental illness, sub-

stantial evidence in this record also brings into account Plaintiff's psychological stability.

The Court is aware of Plaintiff's young age. Nevertheless, "Crohn's disease is a chronic, inflammatory disease of the gastrointestinal tract which produces symptoms such as severe abdominal pain, cramping, nausea, fatigue, diarrhea, and insomnia. .... The disease is often accompanied by periods of inactivity as well as a high rate of recurrence after treatment." *Dix v. Sullivan,* 900 F.2d 135, 136 (8th Cir.1990). As the Court, in *Dix* wrote:

> "A finding that a claimant is able to engage in substantial gainful activity requires more than a simple determination that the claimant can find employment and that he can physically perform certain jobs; it also requires a determination that the claimant can *hold* whatever job he finds for a significant period of time." *Singletary v. Bowen,* 798 F.2d 818, 822 (5th Cir.1986)(emphasis in original); *see also Totten v. Califano,* 624 F.2d 10, 12 (4th Cir.1980)(claimant's incapacitation for periods of three days during every two weeks with medical impairments and effects expected to last at least twelve months not insufficient to establish a continuous period of disability). A condition that does not allow a person to work on a regular basis precludes substantial gainful activity. *Broadbent v. Harris,* 698 F.2d 407, 413 (10th Cir.1983).

*Id.* at 138.

Although afflicted with a presently disabling illness, Plaintiff is a young woman. If she continues to follow the medical treatment prescribed by her physicians, *perhaps*[2] Plaintiff will be able to recover from her disability and return to work. In

this regard, the Court is reminded of *Jeffcoat v. Bowen,* 840 F.2d 592, 595 n. 2 (8th Cir.1988), wherein the Court of Appeals wrote: "... Jeffcoat is a young man, and it would be highly regrettable if a disability that could be overcome through proper training were to prevent him from becoming a productive member of society and keep him on the public welfare rolls for the rest of his life." Until such time, however, Plaintiff is entitled to the benefits for which she applied.

■ The final decision of the Commissioner is not supported by substantial evidence on the record as a whole. Plaintiff has proved her case with medical and other evidence. The Commissioner, therefore, is ordered to award Plaintiff the benefits to which she is entitled

## CONCLUSION AND DECISION

It is the holding of this Court that Commissioner's decision is not supported by substantial evidence on the record as a whole. The Court finds that the evidence in this record is transparently one sided against the Commissioner's decision. *See Bradley v. Bowen,* 660 F.Supp. 276, 279 (W.D. Arkansas 1987). A remand to take additional evidence would only delay the receipt of benefits to which Plaintiff is entitled.

The final decision of the Commissioner is reversed and the Commissioner is ordered to award Plaintiff the benefits to which she is entitled.

The judgment to be entered will trigger the running of the time in which to file an application for attorney's fees under 28 U.S.C. § 2412(d)(1)(B) (Equal Access to Justice Act). *See also, McDannel v. Apfel,* 78 F.Supp.2d 944 (S.D.Iowa 1999) (discuss-

---

2. I say *perhaps* because Crohn's disease is "an incurable illness which waxes and wanes in intensity and symptoms." *See, Denson v.*

*Barnhart,* 401 F.Supp.2d 1250, 1253 (S.D.Ala. 2005).

ing, among other things, the relationship between the EAJA and fees under 42 U.S.C. § 406 B), and LR 54.2(b)[3]. *See also, Gisbrecht v. Barnhart,* 535 U.S. 789, 122 S.Ct. 1817, 1821, 152 L.Ed.2d 996 (2002); *Mitchell v. Barnhart,* 376 F.Supp.2d 916 (S.D.Iowa 2005).

IT IS SO ORDERED.

---

3. N.B. Counsel is reminded that LR 54.2(b), states that an EAJA application "must specifically identify the positions taken by the government in the case that the applicant alleges were not substantially justified."