Thomas O'NEILL, Plaintiff,

v.

Michael J. ASTRUE, Commissioner of Social Security, Defendant.

Civ. No. 09–3042 (JJK).

United States District Court, D. Minnesota.

Feb. 1, 2011.

Frederick J. Daley, Jr. and Edward Olson, Esqs., for Plaintiff.

Lonnie F. Bryan, Esq., Assistant United States Attorney, for Defendant.

## MEMORANDUM OPINION AND ORDER

JEFFREY J. KEYES, United States Magistrate Judge.

Pursuant to 42 U.S.C. § 405(g), Plaintiff Thomas O'Neill seeks judicial review of the final decision of the Commissioner of Social Security ("the Commissioner"), who denied Plaintiff's application for disability-insurance benefits and supplemental security income. The parties consented to the Court's exercise of jurisdiction over all

proceedings in this case pursuant to 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73 and filed cross-motions for summary judgment. (Doc. Nos. 12, 18). For the reasons stated below, this Court recommends that Plaintiff's motion for summary judgment be granted and Defendant's motion for summary judgment be denied.

## BACKGROUND

### I. Procedural History

Plaintiff filed applications for disability-insurance benefits and supplemental security income on April 25, 2006, alleging a disability-onset date of October 15, 2004. (Tr. 21.) The applications were denied initially and on reconsideration. (Tr. 21, 53–57, 59–61.) Plaintiff timely requested a hearing, which was held before an Administrative Law Judge ("ALJ") on May 20, 2008. (Tr. 52, 405–427.) On December 10, 2008, the ALJ issued an unfavorable decision. (Tr. 18–32.) Plaintiff sought review of the ALJ's decision, but the Appeals Council denied the request for review on August 27, 2009. (Tr. 4–6.) The ALJ's decision therefore became the final decision of the Commissioner. *See* 20 C.F.R. § 404.981. On October 30, 2009, Plaintiff filed the instant action with the Court seeking judicial review pursuant to 42 U.S.C. § 405(g). The parties then cross-moved for summary judgment. *See* D. Minn. L.R. 7.2.

### II. Factual Background and Medical History

Plaintiff was born on May 21, 1950, and at the time of his alleged onset of disability on October 15, 2004, he was 54 years-old. (Tr. 64.) He is single and, prior to his onset date, lived alone in an apartment. (Tr. 189–90.) Plaintiff has a two-year degree in mortuary science. (Tr. 408.) The vocational expert determined that Plaintiff has past relevant work as a short order cook at a light exertional level, and a telemarketer, at a sedentary exertional level. (Tr. 168.) On May 6, 2008, Plaintiff's former employer, Gary Houdek at Jitters Coffee House, wrote a letter to the SSA on Plaintiff's behalf. (Tr. 172.) He indicated that Plaintiff worked at the coffee house from October 30, 2006 for approximately seven weeks. (*Id.*) He wrote that it was evident to him that Plaintiff had discomfort from standing for long periods of time, and this forced Plaintiff to resign. (*Id.*) Plaintiff alleged that he is precluded from working due to Crohn's disease,[1] a lung condition, depression, bipolar disorder, sciatica, and status post three intestinal surgeries with a net sewn into his abdomen to keep the intestines in place. (Tr. 89–90.)

The record contains a confidential diagnostic review regarding Plaintiff from the Northeast Regional Corrections Center, dated July 15, 2003, before Plaintiff's alleged onset of disability. (Tr. 208.) Plaintiff was referred for a clinical assessment as part of the intake procedure. (*Id.*) Plaintiff reported a past history of electro-shock therapy (ECT) for the purpose of disrupting his cyclic pattern of bipolar disorder. (*Id.*) Plaintiff's manic episodes were typically three days of disinhibition and alcohol craving. (*Id.*) His depressive episodes were characterized by isolation, fatigue, poor concentration, and reduced energy. (*Id.*) Plaintiff used alcohol to medicate his pain from depression. (*Id.*)

---

1. Crohn's disease is a chronic, relapsing inflammatory disease that produces bouts of diarrhea, cramping of the abdomen and fever. Treatment is symptomatic. Surgical removal of the diseased portion of the intestine is reserved for the cases most resistant to treatment. *Miller–Keane Encyclopedia & Dictionary of Medicine, Nursing & Allied Health* 438 (7th ed.2003).

On November 14, 2004, about a month after the alleged disability onset date, Plaintiff went to the emergency room at St. Luke's Hospital and reported feeling depressed and hopeless, with thoughts of killing himself. (Tr. 185.) He had recently lost his job and started drinking alcohol. (*Id.*) Plaintiff reported he was calling in sick to his job as a telemarketer because he was sleeping too much, likely because he was depressed. (*Id.*)

Plaintiff also reported a history of recurrent lung infections of unknown cause. (Tr. 186.) On examination, Plaintiff was pleasant and well groomed but sad. (Tr. 185.) Plaintiff had a long history of depression, but he had discontinued his antidepressants fifteen months before he was admitted to the hospital. (*Id.*) He was admitted to the mental health unit. (Tr. 186.)

Plaintiff had a chest x-ray to evaluate cough and chronic lung disease the next day. (Tr. 203–04.) There was no significant change from Plaintiff's x-rays of July 13 and 26, 2004. (Tr. 204, 203.) The x-rays showed "prominent interstitial[2] markings bilaterally, likely chronic interstitial scarring ... bilateral pleural thickening and old right sided rib fractures." (Tr. 204.)

Plaintiff was also evaluated by Dr. Timothy Kleinschmidt that day. (Tr. 187–88.) Dr. Kleinschmidt noted that Plaintiff had recently lost his job and his apartment and became suicidal. (Tr. 187.) He noted that Plaintiff had discontinued taking Prozac and Depakote because he believed his mood problems were all due to chronic alcoholism. (*Id.*) Plaintiff reported that his mood went downhill after he was hospitalized in July 2004, and previous to that,

he had fifteen months of sobriety. (*Id.*) Plaintiff also reported that his Crohn's disease was stable. (*Id.*) Dr. Kleinschmidt assessed the following: chronic lung disease with worsening depression and likely underlying bipolar and chemical dependency; Crohn's disease; and likely bronchitis in a smoker with a history of chronic lung disease. (Tr. 188.)

Dr. Steven Hahn at St. Luke's referred Plaintiff for individual therapy, which began on November 16, 2004 with Licensed Social Worker Thomas Lewandowski. (Tr. 189–90.) Mr. Lewandowski noted that Plaintiff's admission to the hospital occurred while Plaintiff was intoxicated on alcohol. (Tr. 189.) On mental status examination, Plaintiff was alert and oriented in all spheres with no evidence of psychosis or delusional thinking. (*Id.*) Mr. Lewandowski described Plaintiff as "overlying expressive at times with a tendency to embellish the negative as well as the positive events in his life." (*Id.*) He believed Plaintiff's ability to problem solve was impaired. (*Id.*)

Plaintiff reported a significant history of alcohol addiction with his most recent relapse from sobriety twelve weeks earlier. (Tr. 189.) In the last ten weeks, he was "drinking around the clock," and lost his job and apartment. (*Id.*) He was willing to try medication and to consider chemical dependency treatment. (Tr. 190.)

Plaintiff was discharged on November 19, 2004, with the following diagnoses: chemical dependency; alcoholism; major depression; moderate to severe with suicidal intent and plan; chronic lung disease, likely chronic obstructive pulmonary disease with intermittent acute inflammatory abnormalities with FUO[3] and unresolved

---

**2.** Interstitial means pertaining to or situated between parts or in the interstices (small interval, space or gap) of a tissue. *Dorland's Illustrated Medical Dictionary* 965 (31st ed.2007).

**3.** FUO stands for fever of unknown origin. *Dorland's* 761.

lung biopsy question; history of Crohn's disease with prior Remicade;[4] and depression, with questionable bipolar features in the past. (Tr. 182.) Plaintiff's medications were Depakote, Prozac, Combivent, Avelox, Advair, Ambien, and vitamin B12. (*Id.*) Plaintiff was stable for transfer to another facility for ongoing therapy for depression, bipolar status and chemical dependency. (*Id.*) The record does not indicate what facility Plaintiff was transferred to or how long he was there.

On January 11, 2006, a nurse completed a physical assessment of Plaintiff. (Tr. 207.) She noted that Plaintiff had a questionable injury to his lower back, shortness of breath with limited lung expansion, Crohn's disease with stomach pain and diarrhea, bipolar disorder and depression. (*Id.*) She limited Plaintiff to lifting ten to fifteen pounds. (*Id.*)

Plaintiff saw Dr. Juan Colareta at St. Luke's Mental Health Services for a psychiatric assessment on May 1, 2006. (Tr. 253–55.) Plaintiff reported not feeling significantly depressed lately. (Tr. 253). He was taking his medications and was sober since November 2005. (*Id.*) He denied feeling suicidal. (*Id.*) Dr. Colareta noted the following:

> He has been sleeping seven to eight hours per night, has not been particularly irritable, has not been getting involved in impulsive activities that he later regrets. Has not been more active than usual. He does acknowledge some occasional racing thoughts but his speech is not pressured. He is some-

what entitled and has a somewhat inflated self esteem. His concentration appears to be fairly good. He denies any history of psychotic symptoms.

(*Id.*)

Dr. Colareta noted that Plaintiff had been living with his brother but was planning to voluntarily go to a sober house. (*Id.*) He also noted that Plaintiff last worked in March 2005 at Rainbow foods but lost his job several months later when he relapsed with alcohol use. (Tr. 254.) He noted Plaintiff had been to a correctional facility in the past for probation violations. (*Id.*) Dr. Colareta diagnosed: 1) mood disorder, NOS and to rule out major depressive disorder, recurrent, severe and in remission versus bipolar disorder; 2) alcohol dependence; 3) possible personality disorder, NOS; and he assessed a GAF score of 50.[5] Plaintiff declined psychotherapy, and Dr. Colareta increased Depakote. (*Id.*)

Plaintiff saw Dr. Colareta again on May 16, and they discussed Plaintiff's diagnoses, particularly whether Plaintiff's impulsivity and questionable past decisions were caused by bipolar disorder or by certain personality traits. (Tr. 251.) Plaintiff acknowledged that he tended to be intolerant and with inflated expectations of how others should treat him. (*Id.*) Plaintiff reported that his mood was fairly stable with some irritability but without significant depression. (*Id.*) Plaintiff was sleeping well and there was no evidence of mania or hypomania. (*Id.*) Dr. Colareta

---

4. Remicade is indicated for reducing signs and symptoms and inducing and maintaining clinical remission in patients with moderately to severely active Crohn's disease who have had an inadequate response to conventional therapy. *Physician's Desk Reference ("PDR ")* 904–05 (65th ed.2011).

5. "[T]he Global Assessment of Functioning Scale [GAF] is used to report 'the clinician's

judgment of the individual's overall level of functioning.' " *Hudson ex rel. Jones v. Barnhart*, 345 F.3d 661, 662 n. 2 (8th Cir.2003) (quoting *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. Text Revision 2000) ("DSM–IV–TR")). A GAF score of 41–50 indicates serious symptoms or any serious impairment in social, occupational or school functioning. *DSM–IV–TR* 32.

noted that Plaintiff had a "somewhat entitled presentation."[6] (*Id.*) He questioned narcissistic personality traits. (*Id.*)

On June 20, 2006, Plaintiff reported to Dr. Colareta that he was doing fairly well, with some brief episodes of a few hours of racing thoughts and some irritability. (Tr. 250.) Plaintiff was sleeping well, and Dr. Colareta noted, "there is some entitlement at baseline." (*Id.*) Plaintiff denied feeling significantly depressed. (*Id.*) He agreed to take a personality test and to consider psychotherapy. (*Id.*)

Plaintiff followed up with Dr. Kleinschmidt at St. Luke's Internal Medicine Associates on June 27, 2006. (Tr. 226–28.) He reported improvement in his mood with the following physical symptoms: low grade fever, baseline cough, intermittent cramping and rectal bleeding, back pain with radiation. (Tr. 226.) Plaintiff's examination was normal. (Tr. 227.) Because Plaintiff had no neuromuscular effects, MRI of his spine was not indicated for his sciatica. (*Id.*) Plaintiff was treating his sciatica with Ibuprofen and Lortab,[7] and was advised to continue. (Tr. 226–27.) He was referred for endoscopy to evaluate Crohn's disease. (Tr. 227.)

On July 6, 2006, Plaintiff had red blood cells in his urine. (Tr. 223.) Dr. Kleinschmidt recommended a CT scan and cystoscopy. (*Id.*) Plaintiff had a CT scan of his abdomen. (Tr. 236–41) The impression from the scan was a stone in the right kidney, slightly increased since previous examination; calcification in left kidney[8]

that could represent a second stone or vascular calcification, new since the previous examination; and small calcification in the gall bladder that could represent a gallstone, new since previous examination. (Tr. 240–41.) There was no evidence of urinary obstruction, cholecystitis or biliary obstruction. (Tr. 241.) Plaintiff also underwent a retrograde pyelogram,[9] which was normal. (Tr. 234.)

Plaintiff had a colonoscopy and colon biopsy at St. Luke's Gastroenterology Associates on August 2, 2006. (Tr. 244.) The biopsy was consistent with Crohn's disease with no evidence of cancer. (*Id.*)

On August 4, 2006, Plaintiff saw Dr. Kleinschmidt in follow up for Crohn's disease. (Tr. 221.) Plaintiff reported that his mood was doing well, he was sober for nine months, and he denied chest pain, shortness of breath and abdominal cramping. (*Id.*)

On August 7, 2006, Plaintiff saw Dr. Roger Miller at St. Luke's Urology Associates for evaluation of blood in his urine. (Tr. 317–18.) Dr. Miller assessed bilateral renal calculi, noted that the radiographic evaluation was inadequate, and he recommended a cystoscopy. (Tr. 318.) On September 8, 2006, the cystoscopy was negative aside from a left kidney stone. (Tr. 319.)

Dr. Russell Ludeke, a state agency consultant, reviewed Plaintiff's file and completed a Mental Residual Functional Capacity Assessment form and Psychiatric Review Technique form regarding Plaintiff

---

**6.** "A sense of entitlement" is a diagnostic criterion for narcissistic personality disorder in the *Diagnostic and Statistical Manual of Mental Disorders* (4th ed. text revision American Psychiatric Association 2000) ("*DSM–IV–TR* "). *DSM–IV–TR* defines "a sense of entitlement" as unreasonable expectations of especially favorable treatment or automatic compliance with his or her expectations.

**7.** Lortab, which contains hydrocodone bitartrate and acetaminophen, is indicated for relief from moderate to moderately severe pain. *PDR* 3240.

**8.** A formation of renal calculi is also called nephrolithiasis, a term which is also used in Plaintiff's medical records. *Dorland's* 1260.

**9.** Pyelogram is a radiograph of the kidney and ureter. *Dorland's* 1582.

for the SSA on August 14, 2006. (Tr. 264–281.) He opined that Plaintiff had the mental residual functional capacity to concentrate on, understand and remember routine, repetitive, three and four step and limited detailed instructions with adequate persistence and pace; cope with coworkers for brief and superficial contact; handle brief, infrequent and superficial contact with the public; cope with reasonably supportive supervisory styles that could be expected to be found in many customary work settings; and tolerate routine stresses of a routine, repetitive, three to four step or limited detail work setting. (Tr. 266.)

Dr. Ludeke also found Plaintiff to have a substance addiction disorder under Listing 12.09 and a mood disorder under Listing 12.04. (Tr. 271, 276.) Under the "B" criteria of the Listings, he found Plaintiff to have mild restriction in activities of daily living, moderate difficulties in maintaining social functioning and in maintaining concentration, persistence or pace, and no episodes of decompensation. (Tr. 278.) He found Plaintiff to have no evidence of the "C" criteria of Listing 12.04. (Tr. 279.)

Dr. Juan Colerata referred Plaintiff for psychological evaluation to Yvonne Prettner Solon, who conducted a MMPI–2 (Minnesota Multiphasic Personality Inventory–2), on August 23, 2006. (Tr. 256.) Ms. Solon opined that Plaintiff cooperated with testing, and the profile should be viewed as valid. (*Id.*) The profile indicated a person with diverse interests, somewhat passive in interpersonal relationships, generally self-controlled, dislikes confrontation, difficulty expressing anger, likely to be outgoing and sociable with a strong need to be around others, gregarious and enjoys attention. (*Id.*)

On August 30, 2006, state agency consultant, Dr. Charles Grant, completed a Physical Residual Functional Capacity Assessment regarding Plaintiff for the SSA. (Tr. 282–89.) Based on his review of the record, Dr. Grant opined that Plaintiff could occasionally lift and carry 50 pounds; frequently lift and carry 25 pounds; stand and/or walk a total of six hours in an eight-hour workday; sit for a total of six hours in a normal workday; and perform unlimited push and pull with hand and foot controls. (Tr. 283.) He further opined that Plaintiff could only occasionally climb ramps, stairs, ladders, ropes or scaffolds, and occasionally stoop, crouch and crawl. (Tr. 284.) Dr. Dan Larson reviewed and affirmed Dr. Grant's opinion on April 12, 2007. (Tr. 289.)

Plaintiff had chest x-rays to evaluate shortness of breath on September 6, 2006. (Tr. 235.) The x-rays showed mild scarring in the lower left lung, but the lungs were otherwise clear and unchanged from a prior study of November 15, 2004. (*Id.*)

Plaintiff saw Dr. Colareta the next week, and reported feeling somewhat anxious because he was undergoing tests to rule out cancer. (Tr. 248.) His Crohn's disease was more active. (*Id.*) Plaintiff denied significant depression, and he was sleeping well. (*Id.*) Dr. Colareta noted that narcissistic personality traits were not supported by the MMPI, but he kept it as a possible diagnosis. (*Id.*) Plaintiff felt Depakote was helping his depression and sleep. (*Id.*)

Dr. Kleinschmidt referred Plaintiff to Dr. Stephen Hadley for a bone mineral density assessment due to long term corticosteroid treatment for Crohn's disease. (Tr. 232–33.) The scan was performed on October 17, 2006, and indicated no significant bone loss. (*Id.*)

Plaintiff continued to do well psychologically when he saw Dr. Colareta on November 13, 2006. (Tr. 247.) He was sleeping well, was less distracted by racing thoughts, his mood was stable, and he was not particularly irritable. (*Id.*) Plaintiff was close to one year of sobriety. (*Id.*)

Plaintiff saw Dr. Kleinschmidt in follow up on November 20, 2006. (Tr. 211.) He denied chest pain, shortness of breath and fatigue. (*Id.*) He had a bit of a wheeze as opposed to a cough. (*Id.*) He was doing well with sobriety and on a mood stabilizer. (*Id.*) He had "ups and downs" with Crohn's disease. (*Id.*) Dr. Kleinschmidt advised Plaintiff it was alright for him to use Lortab as needed for chronic pain, noting that he had some radicular type symptoms. (Tr. 212.)

Dr. Kleinschmidt completed a Medical Opinion form regarding Plaintiff on December 29, 2006. (Tr. 209.) He indicated that Plaintiff could not work for the foreseeable future due to back pain and sciatica. (*Id.*)

Plaintiff returned to Dr. Kleinschmidt on January 26, 2007, for evaluation of cough for one or two weeks. (Tr. 210.) Plaintiff also reported chest pain and right back pain with deep breaths. (*Id.*) Dr. Kleinschmidt noted Plaintiff had cut back significantly on tobacco use. (*Id.*) He prescribed Prednisone. (*Id.*) Plaintiff also had chest x-rays. (Tr. 229, 374.) The x-rays indicated interstitial change or scarring within the left lung without significant change from the prior study on September 6, 2006, and new atelectasis[10] at the right lung base. (Tr. 229.)

When Plaintiff saw Dr. Colareta on March 12, 2007, he had maintained sobriety and was not significantly depressed, although he felt somewhat down for brief periods. (Tr. 246.) He was able to come off his down periods fairly easily. (*Id.*)

Plaintiff followed up with Dr. Miller on March 28, 2007. (Tr. 320.) Dr. Miller noted Plaintiff's kidney stone was stable, and Plaintiff did not have hematuria. (*Id.*) Seven months later, there was no change in Plaintiff's kidney stone. (Tr. 322.)

Plaintiff had a pulmonary function test on June 4, 2007. (Tr. 357.) Spirometry[11] was suggestive of restriction, with reduction in the FEV1 and FVC.[12] (*Id.*) There was no significant evidence of airway reactivity, and total lung capacity fell within normal limits, but there was a suggestion of a degree of air trapping. (*Id.*) Diffusion capacity was reduced. (*Id.*) Dr. Wayne Elmer at St. Luke's opined that the test results may represent a mixed obstructive restrictive scenario. (*Id.*)

About a week later, Plaintiff had a colonoscopy, which indicated active Crohn's disease involving the anastomosis[13] and the distal small bowel. (Tr. 356.) The next day, a surgical pathology report indicated that biopsies of Plaintiff's colon showed active colitis with ulcer debris but no evidence of dysplasia or malignancy. (Tr. 381.)

On July 26, 2007, Plaintiff saw Dr. Colareta and reported having only mild and brief periods of dysphoria and no mania or hypomania. (Tr. 397.) Plaintiff also reported that he quit smoking as of June 11, 2007. (*Id.*) Plaintiff next saw Dr. Colareta on December 4, 2007, and reported a fairly stable mood, with some hyperactivity and racing thoughts for a few hours, followed by a low mood for one or two days. (Tr. 396.) Plaintiff reported that he recognized

---

**10.** Atelectasis means the following: 1) incomplete expansion of a lung or portion of a lung; 2) airlessness or collapse of a lung that had once been expanded; and 3) absence of air in a normally air-filled space. *Dorland's* 173.

**11.** Spirometry is a measurement of the breathing capacity of the lungs. *Dorland's* 1776.

**12.** FEV means forced expiratory volume and FVC means forced vital capacity. *Dorland's* 699, 763.

**13.** Anastomosis is an opening created by surgical, traumatic or pathological means between two normally separate spaces or organs. *Dorland's* 75.

these episodes and tried to limit his exposure to others because he tended to be impulsive and mean at such times. (*Id.*) Plaintiff also reported being somewhat anxious about a prostate biopsy. (*Id.*) Dr. Colareta increased Plaintiff's Depakote. (*Id.*)

On December 7, 2007, Plaintiff had biopsies to rule out prostate cancer. (Tr. 323, 327–28, 333–34.) Due to Plaintiff's complaint of right sciatica, he had x-rays of his pelvis and thoracic spine on December 19, 2007. (Tr. 331–32.) There was mild degenerative change in his mid-thoracic spine, and x-ray of his pelvis was normal. (*Id.*) Several weeks later, Dr. Miller informed Plaintiff that he believed Plaintiff had cancer localized to the prostate. (Tr. 324–25.) Plaintiff was referred to the University of Minnesota Hospitals and Clinics for surgical treatment. (*Id.*) Plaintiff then had biopsies of the esophagus, stomach, and duodenum on January 9, 2008 at St. Luke's. (Tr. 391.) A hernia was found in the stomach and ulcerations in the esophagus and duodenum, most likely secondary to reflux and Crohn's disease. (*Id.*)

Plaintiff was given a final diagnosis of prostate adenocarcinoma on January 17, 2008, at the University of Minnesota Center, Fairview. (Tr. 292–93.) The next day, Plaintiff saw Dr. J. Kyle Anderson in consultation. (Tr. 314–16.) A review of systems was significant for fatigue, coughing, wheezing, heartburn, diarrhea, abdominal pain, back problems and depression. (Tr. 315.) Physical examination was normal. (Tr. 315.) Dr. Anderson assessed prostate cancer and Crohn's disease status post multiple abdominal surgeries including mesh placed within the abdomen and most likely lower abdomen. (*Id.*) Plaintiff's history of Crohn's disease and placement of

mesh in the lower abdomen complicated his treatment for prostate cancer. (*Id.*) Dr. Anderson recommended brachytherapy or cryotherapy.[14] (*Id.*) Approximately four months later, Dr. Joseph Lee performed cryotherapy to treat Plaintiff's prostate cancer on April 7, 2008. (Tr. 306–08).

However, before Plaintiff's treatment for prostate cancer, Plaintiff saw Dr. Kleinschmidt on February 6, 2008, with complaints of abdominal pain. (Tr. 353–55.) For several days, he had increased left lower cramping and some diarrhea. (Tr. 353.) The pain had become severe over the last several hours. (*Id.*) He denied any other symptoms. (*Id.*) Dr. Kleinschmidt opined Plaintiff's symptoms were consistent with Crohn's flare, and noted Plaintiff would be monitored closely. (Tr. 355.) Plaintiff was admitted to St. Luke's Hospital that day. (Tr. 343.) A CT scan of Plaintiff's abdomen and pelvis with CT urography, which was performed the next day, indicated a small, irregular filling defect of the left renal pelvis, which indicated the possibility of a tumor. (Tr. 363, 365–66.)

Plaintiff had chest x-rays on February 11, 2008, to evaluate his shortness of breath. (Tr. 362.) The x-rays indicated: increase in bilateral interstitial alveolar "infiltrates" compared to 1/26/2007; extensive bilateral pleural thickening without pleural calcification; and old right sided rib fractures. (*Id.*) Plaintiff's medications were adjusted to include a high dose of steroids. (Tr. 344.) Plaintiff had repeat x-rays on February 14, which showed slight interval improvement in the appearance of the chest, but there were still fairly extensive interstitial densities in both lungs. (Tr. 361.) He was discharged on February 15. (Tr. 343.)

---

**14.** Brachytherapy, in the field of radiotherapy, is treatment with ionizing radiation whose source is either implanted within the body, applied to the surface of the body or located a short distance from the body area being treated. *Dorland's* 248. Cryotherapy is the therapeutic use of cold. *Dorland's* 446.

On February 21, 2008, Dr. J. Kyle Anderson opined that Plaintiff had a left-sided filling defect and right and left-sided kidney stones. (Tr. 310.) It was determined that Plaintiff would first have his kidney stones treated, then proceed with cryotherapy for prostate cancer. (*Id.*) Plaintiff underwent a bilateral ureteroscopy with removal of his kidney stones the next week. (Tr. 301–04.) During the procedure, Dr. Anderson was unable to reproduce any filling defects that earlier testing had suggested. (*Id.*)

Plaintiff returned to the emergency room for evaluation of swelling of his right knee on March 12, 2008. (Tr. 341.) Dr. Kevin Thornton noted that Plaintiff was on weaning doses of Prednisone, his Crohn's disease had "not been bothersome," and Plaintiff was not having any back pain, although he had sciatica in the past. (*Id.*) Dr. Thornton opined "this might be hemarthrosis or an inflammatory effusion given the weaning does of Prednisone and his coexistent Crohn's ..." (Tr. 342.) Plaintiff was told to rest his knee and that it might take several weeks to resolve. (*Id.*)

Plaintiff saw Dr. Colareta again on April 18, 2008, and reported that despite his health issues, his mood remained fairly stable. (Tr. 394.) He denied feeling depressed and said he was enjoying some activities. (*Id.*) Dr. Colareta noted that Plaintiff's level of irritability had noticeably decreased. (*Id.*) Dr. Colareta also noted that Plaintiff's symptoms of narcissistic personality may have been an artifact of Plaintiff's mood fluctuations. (*Id.*)

On May 6, 2008, Dr. Kleinschmidt wrote a letter regarding disability on Plaintiff's behalf. The letter states, in relevant part:

Mr. O'Neill has been my patient for many years now and has chronic Crohn's disease necessitating numerous surgeries and intervention and occasional GI bleeding. More recently his health has been complicated by cancer of the prostate necessitating cryosurgery. In addition, he has chronic obstructive pulmonary disease and chronic bronchitis which in the past has necessitated open lung surgery, lung biopsies, and has limited him from a cardiovascular and respiratory standpoint. Additionally, he has sciatica and spinal stenosis which has been evaluated over the years and limits his ability to do any long distance walking or standing in one position for any period of time.

Finally, Mr. O'Neill suffers from chronic depression with bipolar features. Throughout all of his illnesses, he has been quite compliant with therapy. However, it is my opinion that with these numerous medical problems, together with an immunosuppressed medical condition due to treatment of his Crohn's, that he is unable to sustain significant employment and is medically disabled.

(Tr. 393.)

Dr. Kleinschmidt wrote another letter to the SSA regarding Plaintiff's condition on May 22, 2008. (Tr. 13.) He wrote the following:

Mr. O'Neill has severe Crohn's disease with frequent need for bowel movements and actually unfortunately suffers occasional incontinence from this, which complicates his ability to be employed. He has had prior strictures in his intestinal tract, and due to the extensive prior abdominal surgeries, he has mesh [15] in place. Any significant lifting

15. Surgical mesh is used in tension free hernioplasty, which involves reinforcing the defect with a mesh sheet or plug, thus avoiding the tension caused by suturing together structures not normally in apposition. *Dorland's* 863.

over 10 to 15 pounds on occasion would predispose him to hernia,[16] complications with the mesh, and his chronic abdominal problems.

Finally, he does have significant spinal stenosis, which limits his ability to stand for more than 10 to 15 minutes at a time and would certainly not allow him to stand for the majority of the day. For his spinal stenosis, he is on chronic pain medicines and has needed intermittent injections of the spine.

(Tr. 13.)

## III. Testimony at the Administrative Hearing

### Plaintiff's Testimony

Plaintiff testified at the hearing before the ALJ on May 20, 2008. (Tr. 408–18.) He has a two year degree in mortuary science. (Tr. 408.) He last worked at a coffee shop for up to twenty hours a week, for approximately seven weeks beginning in October 2006. (*Id.*) Plaintiff had called the Social Security Office and was told he could work up to twenty hours a week, but ultimately he was unable to do so. (Tr. 408–09.) His last full-time job was as a telemarketer for approximately eleven months. (Tr. 409–10.) His telemarketing job ended when he had two open lung biopsies. (Tr. 410.) He also had past work in a grocery store deli and as a cook. (*Id.*)

Plaintiff can no longer work due to five chronic conditions. (Tr. 411.) He has had three surgeries from Crohn's disease, and part of his intestines was removed. (*Id.*) He was taking Prednisone and was sweating and swollen, which created rumors at work that he was on drugs. (*Id.*) He always had to be near a bathroom, which he used eight to ten times a day. (*Id.*) Crohn's disease also caused terrible pain. (*Id.*)

His second chronic condition was COPD with chronic bronchitis, which caused shortness of breath. (*Id.*) He also suffered chronic depression with bipolar, which made it "difficult to have a good day." (*Id.*) Then, he had surgery for prostate cancer. (*Id.*)

The last time Plaintiff was weaned off Prednisone, in February 2008, he had a Crohn's attack with stricturing[17] and spent ten days in the hospital. (Tr. 412.) The unpredictable nature of his Crohn's flares made him unreliable for work. (*Id.*)

Plaintiff admitted that he had a problem with alcohol. (Tr. 413.) However, he had been sober for thirty months. (*Id.*) Plaintiff also reported that he had electroshock therapy for depression and bipolar beginning in the 1970s. (Tr. 413–14.) He now takes Depakote for depression, which is helpful. (Tr. 414.) He is depressed three to five days a month. (Tr. 414–15.)

Plaintiff also has chronic back pain from sciatica, which has worsened over the years. (Tr. 415.) He more recently has spinal stenosis. (*Id.*) He relies more on a cane now, and if he has sciatica at night, he cannot sit up to get out of bed, so he sleeps with his mattress on the floor. (Tr. 416.) He does not feel he could do his former job as a telemarketer because he wouldn't be reliable, especially because his frequent need to use the bathroom from Crohn's disease. (*Id.*) On a good day, he uses the bathroom six to eight times a day, and on a bad day, eight to twelve or thirteen times. (Tr. 417.) His trips to the bathroom could take five minutes to half

---

**16.** A hernia is the protrusion of a loop or knuckle of an organ or tissue through an abdominal opening. *Dorland's* 859.

**17.** Stricture means stenosis, *Dorland's* 1811; a stricture is a circumscribed narrowing of a hollow structure, usually consisting of deposition of abnormal tissue. *Stedman's Medical Dictionary* 1710 (27th ed.2000).

an hour. (*Id.*) Plaintiff had an episode of incontinence at a family wedding one day and had to go home to shower and change his clothes. (Tr. 418.) He will likely always have to be on Prednisone for Crohn's disease, and it causes swelling and shaking. (Tr. 417.)

**Testimony of Marjorie O'Neill–Maloney**

Plaintiff's sister also testified at the hearing. (Tr. 422–26.) She saw Plaintiff three to five times a week for two to four hours, and brought him food, helped him shop, or just talked. (Tr. 422–23.) She made sure he had clean bedding because of his Crohn's disease. (Tr. 423.) She was aware of instances when Plaintiff had bathroom accidents. (Tr. 423–24.) She could tell by the way he walked whether he was in abdominal pain. (Tr. 424.)

Plaintiff's sister testified that she has her own family and a foster family. (Tr. 424.) Plaintiff wanted to and tried to help them with things, but he was in too much pain. (*Id.*) She also testified that she has seen him in bed for three days with depression. (Tr. 425.) She estimated that he had six depressed days a month. (Tr. 426.)

**Vocational Expert Testimony**

William Rutenbeck testified as a vocational expert. (Tr. 418–22.) The ALJ asked the VE a hypothetical question regarding jobs available to a person with Plaintiff's age, education, work experience, physical and mental impairments and the following limitations: medium exertional work with occasional climbing of stairs, ramps, ladders, ropes or scaffolds; occasional stooping, crouching or crawling; frequent balancing and kneeling; and limited to unskilled work with brief and su-

perficial contact with the public and co-workers; and no rapid or frequent changes in work routine. (Tr. 419.) The VE testified that such a person could not perform Plaintiff's past relevant work, which was semiskilled, but he could perform other work such as industrial cleaner, with 28,000 such jobs in Minnesota; and hand packager, with 3,000 such jobs in Minnesota. (Tr. 419–20.)

The ALJ then added the following qualification to his first hypothetical question: the individual would be likely to be absent three or more days per month and would need ten to fifteen additional breaks throughout the day to go to the bathroom due to Crohn's disease. (*Id.*) The VE testified that such a person would not be competitively employable. (*Id.*)

The ALJ then posed a third hypothetical question: assuming the same qualifications as the first hypothetical question but instead of the limitations to unskilled work, the limitation would be to low end semiskilled work. (Tr. 421.) The VE testified that because Plaintiff's past work had an SVP of 3,[18] he could perform his past relevant work. (*Id.*) The ALJ then asked the VE: assuming he restricted Plaintiff to light work but everything else remained the same, could such a person perform Plaintiff's past relevant work? (*Id.*) The VE responded, "yes." (*Id.*) The VE also testified that his testimony was consistent with the Dictionary of Occupational Titles. (Tr. 421–22.)

**IV. The ALJ's Findings and Decision**

On December 10, 2008, the ALJ issued a decision concluding that Plaintiff was not under a disability as defined by the Social

---

**18.** "In the [Dictionary of Occupational Titles], each job is assigned a number that reflects the job's specific vocational preparation time (SVP), i.e., how long it generally takes to learn the job ... An SVP level of "three" indicates that a job requires more than one month and up to three months of training ..." *Fines v. Apfel,* 149 F.3d 893, 895 (1998) (internal citation omitted).

Security Act from October 15, 2004, through the date of the decision, therefore denying Plaintiff's applications for disability-insurance benefits and supplemental security income. (Tr. 18–32.) The ALJ followed the five-step procedure set out in the Code of Federal Regulations. *See* 20 C.F.R. § 404.1520(a)(4). The Eighth Circuit Court of Appeals has summarized these steps as follows: (1) whether the claimant is currently engaged in "substantial gainful activity"; (2) whether the claimant suffers from a severe impairment that "significantly limits the claimant's physical or mental ability to perform basic work activities"; (3) whether the claimant's impairment "meets or equals a presumptively disabling impairment listed in the regulations (if so, the claimant is disabled without regard to age, education, and work experience)"; (4) "whether the claimant has the residual functional capacity ["RFC"] to perform his or her past relevant work"; and (5) if the claimant cannot perform his or her past work, then the burden is on the Commissioner "to prove that there are other jobs in the national economy that the claimant can perform." *Fines v. Apfel,* 149 F.3d 893, 894–95 (8th Cir.1998).

The ALJ found that Plaintiff had not engaged in substantial gainful activity since his alleged onset date of October 15, 2004; therefore, he met the requirement at the first step of the disability-determination procedure. (Tr. 24.) At step two, the ALJ found that Plaintiff had the following severe impairments: Crohn's disease status-post three intestinal resections (stable), degenerative disc disease with episodes of sciatica, status post prostate cancer and cryosurgery, history of nephrolithiasis, chronic obstructive pulmonary disease (COPD) (stable status-post two lung biopsies), depression and alcohol dependence in sustained remission and a question of narcissistic personality traits. (*Id.*)

At step three, the ALJ found that Plaintiff's physical and mental impairments did not meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 24–26). Specifically, the ALJ concluded that Plaintiff did not meet the "paragraph B" criteria for Listings 12.04, 12.08 or 12.09, because Plaintiff's mental impairments did not result in at least two 'marked' limitations or one 'marked' limitation and 'repeated' episodes of decompensation. (Tr. 24–25.) The ALJ found that Plaintiff's mental impairments resulted in only mild restrictions in activities of daily living, moderate difficulties in social functioning, moderate difficulties in concentration, persistence or pace, and no episodes of decompensation. (Tr. 25.) The ALJ found no evidence of "paragraph C" criteria. (*Id.*)

The ALJ determined that Plaintiff had the RFC to perform:

> medium work as defined in 20 CFR 404.1567(c) and 416.967(c), that is unskilled, with no more than brief and superficial contact with the public and coworkers and moderate level of stress with routine repetitive tasks.

(Tr. 26.) In reaching this RFC determination, the ALJ considered Plaintiff's subjective statements concerning the intensity, persistence and limiting effects of his symptoms, but found him not entirely credible. (Tr. 27.)

At step four of the disability determination procedure, the ALJ found that Plaintiff was able to perform his past relevant work as a telemarketer. (Tr. 31.) In coming to this conclusion, the ALJ relied on the testimony of the vocational expert. (Tr. 31.) Therefore, the ALJ concluded Plaintiff had not been under a disability, as defined in the Social Security Act, from October 15, 2004 through the date of the decision. (Tr. 31.)

## DISCUSSION

### I. Standard of Review

Congress has prescribed the standards by which Social Security Disability benefits may be awarded. "Disability" under the Social Security Act means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). "An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

■ Review by this Court of the Commissioner's decision to deny disability benefits to a claimant is limited to a determination of whether the decision of the Commissioner is supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g); *Baker v. Barnhart,* 457 F.3d 882, 892 (8th Cir.2006). "There is a notable difference between 'substantial evidence' and 'substantial evidence on the record as a whole.'" *Gavin v. Heckler,* 811 F.2d 1195, 1199 (8th Cir.1987) (quotation omitted). Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (quotations omitted); *see also Haley v. Massanari,* 258 F.3d 742, 747 (8th Cir.2001) (quoting *Beckley v. Apfel,* 152 F.3d 1056, 1059 (8th Cir.1998)). "'Substantial evidence on the record as a whole, ... requires a more scrutinizing analysis." *Gavin,* 811 F.2d at 1199. "The

substantial evidence test employed in reviewing administrative findings is more than a mere search of the record for evidence supporting the [Commissioner's] findings." *Id.* (quoting *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 488, 71 S.Ct. 456, 95 L.Ed. 456 (1951)).

■ In reviewing the record for substantial evidence, the Court may not substitute its own opinion for that of the ALJ. *Woolf v. Shalala,* 3 F.3d 1210, 1213 (8th Cir.1993). The Court may not reverse the Commissioner's decision merely because evidence may exist to support the opposite conclusion. *Mitchell v. Shalala,* 25 F.3d 712, 714 (8th Cir.1994); *see also Woolf,* 3 F.3d at 1213 (concluding that the ALJ's determination must be affirmed, even if substantial evidence would support the opposite finding.) The possibility that the Court could draw two inconsistent conclusions from the same record does not prevent a particular finding from being supported by substantial evidence. *Culbertson v. Shalala,* 30 F.3d 934, 939 (8th Cir.1994).

■ The claimant bears the burden of proving his or her entitlement to disability-insurance benefits under the Social Security Act. *See* 20 C.F.R. § 404.1512(a); *Young v. Apfel,* 221 F.3d 1065, 1069 n. 5 (8th Cir.2000); *Thomas v. Sullivan,* 928 F.2d 255, 260 (8th Cir.1991). Once the claimant has demonstrated that he or she cannot perform past work due to a disability, "the burden shifts to the Commissioner to prove, first that the claimant retains the residual functional capacity to do other kinds of work, and second that other work exists in substantial numbers in the national economy that the claimant is able to do." *Nevland v. Apfel,* 204 F.3d 853, 857 (8th Cir.2000).

## II. Analysis of the ALJ's Decision

Plaintiff raises the following objections to the ALJ's decision. First, he contends the ALJ improperly weighed the record evidence, made an erroneous and incomplete RFC finding, and substituted his lay opinion for that of the treating physician. Second, he argues the ALJ's credibility analysis is erroneous. Third, he contends the ALJ's step four finding is contrary to the testimony of the VE, and that the alternative fifth step hypothetical question was inadequate because it did not contain all of Plaintiff's limitations.

### A. Evaluating the Physicians' Opinions

A treating physician's opinion is typically entitled to controlling weight if it is "well-supported by medically acceptable clinical and laboratory and diagnostic techniques" and not inconsistent with other substantial evidence in the record. *Leckenby v. Astrue*, 487 F.3d 626, 632 (8th Cir.2007) (quoting *Prosch v. Apfel*, 201 F.3d 1010, 1012–13 (8th Cir.2000) (quoting 20 C.F.R. § 404.1527(d)(2))). "An ALJ may discount such an opinion if other medical assessments are supported by superior medical evidence, or if the treating physician has offered inconsistent opinions." *Holmstrom v. Massanari*, 270 F.3d 715, 720 (8th Cir.2001). "A non-treating physician's assessment does not alone constitute substantial evidence if it conflicts with the assessment of a treating physician." *Lehnartz v. Barnhart*, 142 Fed.Appx. 939, 942 (8th Cir.2005).

Here, the ALJ refused to give weight to Dr. Kleinschmidt's opinion letters of May 6 and May 22, 2008, for the following reasons. First, the ALJ stated Dr. Kleinschmidt provided the opinion letters to Plaintiff for the sole purpose of obtaining disability benefits. (Tr. 28.) Second, he noted that Dr. Kleinschmidt's treatment records indicated that Plaintiff

was stable with treatment and with no side effects from medication. (*Id.*) Third, the ALJ found that Dr. Kleinschmidt's work restrictions were not consistent with the treating and diagnostic test and examination results, which reflected a stable condition after treatment. (*Id.*) Fourth, he stated that Dr. Kleinschmidt's opinion was based primarily on Plaintiff's subjective complaints, which lacked credibility. (*Id.*) Fifth, the ALJ noted that the issue of disability is reserved for the Commissioner. (*Id.*)

Plaintiff asserts Dr. Kleinschmidt's opinion should be granted greater weight because it was based on Plaintiff's current medical conditions, his treatments over the years, and the analysis of his medical problems, which were supported by objective evidence. Plaintiff argues that the ALJ erred by rejecting Dr. Kleinschmidt's opinion, which was based on objective evidence that Plaintiff could not lift more than ten to fifteen pounds occasionally because the surgical mesh in his abdomen predisposed him to hernia, not on plaintiff's subjective complaints. Plaintiff further contends the ALJ substituted his own lay opinion for that of a physician by determining that Plaintiff could lift greater weights. Plaintiff also asserts that the ALJ erred by relying on the state agency physicians' RFC opinion because it was unclear whether those physicians were even aware of Plaintiff's abdominal mesh.

Plaintiff further argues that his diagnosis of Crohn's disease is consistent with his need to use the bathroom ten or more times on a bad day, and that by rejecting Dr. Kleinschmidt's opinion of his need to use the bathroom frequently, the ALJ improperly substituted his own lay opinion. Finally, Plaintiff argues the ALJ failed to consider the combined effect of his impairments, and that the ALJ only cited evidence that supported his opinion and ig-

nored evidence such as scarring on the lungs and chest x-rays showing an increase in infiltrates.

Defendant responds that Plaintiff's diagnosis of Crohn's disease alone is insufficient to establish his actual functional loss from the disease. To that effect, Defendant points out that many of Plaintiff's abdominal exams and abdominal x-rays were normal. Defendant points out that in the treatment records, Plaintiff reported only intermittent cramping and bleeding and mild fatigue, and that Plaintiff's Crohn's disease was reported as stable and responding well to treatment.

Defendant also asserts Plaintiff had no functional loss from prostate cancer, and he was doing well one month after surgery. Similarly, Defendant contends that Plaintiff had no functional loss from COPD, his objective findings of COPD were mild, and that Plaintiff denied significant respiratory problems.

Further, Defendant argues that Dr. Kleinschmidt's opinion was inconsistent with his own treatment records indicating that Plaintiff's Crohn's disease was stable, and that Plaintiff was doing well. Defendant contends that the ALJ properly discounted Dr. Kleinschmidt's opinion because it was based on Plaintiff's subjective complaints. Defendant points out that Plaintiff did not report any side effects from medication or any difficulty with sitting or standing. Defendant also argues the ALJ properly relied on Dr. Ludeke's and Larson's mental residual functional capacity opinions because Plaintiff's mental status examinations were normal and his treatment was effective. Finally, Defendant contends the ALJ did not fragmentize Plaintiff's impairments and sufficiently discussed each impairment and its effect on Plaintiff's RFC.

Plaintiff responds that a normal physical exam of his abdomen during an office visit does not establish the absence of diarrhea

at work or his ability to lift more than ten or fifteen pounds with a surgical mesh in his abdomen. Nor is there evidence that the treatment with Prednisone sufficiently controlled his symptoms to allow him to work. Plaintiff contends that had the ALJ considered his impairments in combination, his sciatica and COPD would also limit his ability to do medium exertional work. The Court agrees with Plaintiff.

This is a case where the ALJ must resolve a conflict between the opinions of a treating physician and a state agency medical consultant. See Cantrell v. Apfel, 231 F.3d 1104, 1107 (8th Cir.2000) ("When one-time consultants dispute a treating physician's opinion, the ALJ must resolve the conflict between those opinions.") Dr. Kleinschmidt opined that Plaintiff can lift only ten to fifteen pounds and could not spend the majority of the day on his feet. Dr. Grant, whose opinion was affirmed by Dr. Larson, opined that Plaintiff can perform medium work, which requires the ability to lift twenty-five pounds frequently, fifty pounds occasionally and stand or walk a total of six hours in a workday. "As a general matter, the report of a consulting physician who examined a claimant once does not constitute 'substantial evidence' upon the record as a whole, especially when contradicted by the evaluation of the claimant's treating physician." Wagner v. Astrue, 499 F.3d 842, 849 (8th Cir.2007) (quoting Cantrell, 231 F.3d 1104, 1107 (8th Cir.2000)). The law favors the treating physician's opinion as long as it is "well-supported by medically acceptable clinical and laboratory and diagnostic techniques" and not inconsistent with other substantial evidence in the record. Leckenby, 487 F.3d at 632.

Here, the objective evidence in the record makes clear that Plaintiff's Crohn's disease caused him to undergo three surgeries to remove parts of the intestine and

eventually place a surgical mesh in his abdomen. Dr. Kleinschmidt has explained that lifting more than ten to fifteen pounds in this condition places Plaintiff at risk for hernia and other complications with the mesh and Plaintiff's chronic abdominal problems. The Court concludes that this is precisely the type of reasoned opinion based on objective evidence from a treating physician that is entitled to controlling weight. And if the ALJ doubted Dr. Kleinschmidt's reasoning, he could have obtained medical expert testimony. But he didn't. Instead, he relied on the opinion of a nonexamining state agency consultant who made no comment on the risk involved with lifting twenty-five to fifty pounds daily in competitive employment with Plaintiff's abdominal condition. The ALJ should only grant greater weight to nonexamining consultants' opinions when they are supported by superior evidence or if the treating physician has offered inconsistent opinions. *Hamilton v. Astrue*, 518 F.3d 607, 610 (8th Cir.2008). In this case, the consultants' opinions are not supported by superior evidence, and Dr. Kleinschmidt has not offered inconsistent opinions.

As Plaintiff contends, it is difficult to determine whether Drs. Grant and Larson were even aware the mesh in Plaintiff's abdomen. The first medical record that mentions the mesh is dated January 18, 2008. (Tr. 315.)[19] Dr. Grant reviewed Plaintiff's medical records on August 30, 2006. (Tr. 282–89.) Dr. Larson reviewed the record and affirmed Dr. Grant's opinion on April 12, 2007. (Tr. 289.) In fact, there were many medical records dated after April 12, 2007, which were not reviewed by Drs. Grant or Larson, including Plaintiff's ten day hospitalization for Crohn's disease, treatment for kidney stones, and diagnosis of and surgery for prostate cancer.

Although some of the records are well after Plaintiff's onset date, Plaintiff's diagnosis of Crohn's disease and subsequent surgeries occurred before October 15, 2004.[20] Therefore, Dr. Kleinschmidt's opinion is applicable to the onset date. Furthermore, the vocational expert's report indicates that Plaintiff did not have any past relevant medium exertional level work, negating the possibility that Plaintiff actually performed medium exertional level of work with his abdominal condition.[21] For these reasons, the ALJ erred by failing to grant controlling weight to Dr. Kleinschmidt's opinion.

**19.** In a Disability Report, Plaintiff described his abdominal surgeries and that he had a "net" sewn into his intestines, but it is unclear whether Dr. Grant or Dr. Larson reviewed this document. (Tr. 89–90.)

**20.** According to Plaintiff's Disability Report, the first removal of part of his intestine was in the early 1980s, the second surgery was in the mid–1980s, and the third surgery, with removal of eleven inches of the intestine and surgical placement of netting to hold the intestine in place, was in the mid–1990s. (Tr. 95, 98, 99.)

**21.** Plaintiff completed a work history report, which indicated that he lifted and carried 25 pounds for approximately a total of three hours a day, slightly less than half of his 7.5 hour workday as a Deli Worker. (Tr. 108–09.) Plaintiff only performed this job for two to three months at the beginning of 2005. (*Id.*) Plaintiff testified he quit because he could not do the lifting and standing required. (Tr. 410.) Plaintiff also lifted and carried 20–25 pounds as a breakfast cook in 1999, but he only worked two days a week, and it is unclear how long the job lasted. (Tr. 106–07.) Medium exertional level work, as defined in the Social Security regulations, requires lifting and carrying 25 pounds frequently, which means up to two-thirds of an eight-hour workday, and 50 pounds occasionally, which means up to one third of the day. 20 C.F.R. § 404.1567(c); Social Security Ruling 83–10, 1983 WL 31251, at *5–6 (S.S.A.1983) (defining frequently).

## B. Evaluating Credibility

In evaluating the credibility of a claimant's subjective complaints, the ALJ must consider evidence such as: (1) the claimant's daily activities; (2) the duration, frequency and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness and side effects of medication; and (5) functional restrictions. *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir.1984). The ALJ may discredit subjective complaints when they are inconsistent with the evidence as a whole. *Id.* But the ALJ must detail his reasons for discrediting the testimony. *Cline v. Sullivan*, 939 F.2d 560, 565 (8th Cir.1991).

The ALJ discounted Plaintiff's pain finding that while Plaintiff alleged chronic, severe, unvarying pain, there were medical records indicating that he was in no pain, no acute distress or was comfortable upon examination. Plaintiff also had normal physical examinations regarding strength, reflexes, sensation and range of motion. (Tr. 29.)

The ALJ discounted Plaintiff's complaints regarding depression because when Plaintiff quit drinking and became medication compliant, his depressive symptoms reduced and his mental condition stabilized. (*Id.*) The ALJ also found Plaintiff not motivated to work because he had a long history of marginal earnings related to a long history of alcohol abuse. (Tr. 30.) The ALJ also stated Plaintiff quit his part-time job after calling a Social Security Office because he believed working would preclude him from getting benefits. (*Id.*)

The ALJ discounted Plaintiff's sister's testimony because the medical record did not indicate frequent reports of Plaintiff's loss of bowel control or diarrhea. (*Id.*) The ALJ characterized Plaintiff's conditions as chronic but stable with episodic flares. (Tr. 31.)

The Court finds that the ALJ erred in his credibility analysis by rejecting the lifting restrictions that Dr. Kleinschmidt placed on Plaintiff, which were based on objective evidence of Crohn's disease and abdominal surgeries requiring placement of mesh in his abdomen, not on Plaintiff's subjective complaints. The Court also finds that there is substantial objective evidence that Plaintiff's various chronic conditions required evaluation and treatment during the time spanning from May 2006 through April 2008, to support Dr. Kleinschmidt's opinion that Plaintiff would likely miss three or more days of work per month on average. This includes: (1) the psychiatric treatment with a GAF score of 50 in May 2006 (which later improved) (Tr. 254); (2) fever, cough, intermittent cramping and rectal bleeding, back pain with radiation (Tr. 226–27); (3) hematuria and kidney stones (236–41, 317–19); (4) shortness of breath, scarring in the lung, and active Crohn's disease (Tr. 235, 248); (5) ups and downs with Crohn's disease (Tr. 211); chronic pain with radicular symptoms (212); (6) cough and chest pain with new atelectasis (Tr. 229); (7) reduced pulmonary function (Tr. 357); (8) active Crohn's disease (Tr. 356); (9) hernia in stomach and ulcerations in esophagus and duodenum (Tr. 397); (10) sciatica and evaluation and diagnosis of prostate cancer (Tr. 324–25, 331–332); (11) severe Crohn's flare with hospitalization (Tr. 343); (12) shortness of breath with increase in infiltrates (Tr. 361); (13) kidney stone removal (301–04); (14) and treatment for prostate cancer (Tr. 306–08).

Here, the treatment records show that Plaintiff suffers from the debilitating effects of active Crohn's disease that involve periodic flare-ups involving abdominal pain, cramping, and very frequent episodes of diarrhea, requiring many emergency bathroom trips throughout the day. It is a disease that is characterized by periods of inactivity and then severe recurrence. The Eighth Circuit noted this in *Dix v.*

*Sullivan,* 900 F.2d 135, 138 (8th Cir.1990), having concluded that the claimant was entitled to benefits even though she occasionally received reprieves from her pain and symptoms:

> Since her Crohn's disease became active in 1985, Dix has suffered from frequent flare-ups, and although she is sometimes without symptoms, she is not capable of working on a regular basis. "A finding that a claimant is able to engage in substantial gainful activity requires more than a simple determination that the claimant can find employment and that he can physically perform certain jobs; it also requires a determination that the claimant can *hold* whatever job he finds for a significant period of time." *Singletary v. Bowen,* 798 F.2d 818, 822 (5th Cir.1986) (emphasis in original); *see also Totten v. Califano,* 624 F.2d 10, 12 (4th Cir.1980) (claimant's incapacitation for periods of three days during every two weeks with medical impairments and effects expected to last at least twelve months not insufficient to establish a continuous period of disability). A condition that does not allow a person to work on a regular basis precludes substantial gainful activity. *Broadbent v. Harris,* 698 F.2d 407, 413 (10th Cir. 1983). Although Dix can occasionally go fishing or engage in some light activities, "sporadic or transitory activity does not disprove disability." *See Smith v. Califano,* 637 F.2d 968, 971–[72]92 (3rd Cir. 1981). The record establishes that although Dix receives occasional reprieves from her pain and symptoms, she is not capable of holding a job for a significant period of time.

*Dix,* 900 F.2d at 138.

Therefore, the ALJ erred by rejecting Plaintiff's complaints of needing to use the bathroom frequently because Plaintiff's Crohn's disease was stable. Although "[t]he record establishes that [Plaintiff] receives occasional reprieves from [his][ ] pain and symptoms, [he][ ] is not capable of holding a job for a significant period of time." *Dix,* 900 F.2d at 138. Indeed, the VE testified that if Plaintiff missed three or more days of work per month, he would be unemployable. (Tr. 420.) The VE also testified that competitive employment would not allow a person to use the bathroom ten or more times a day. (*Id.*) Further, Plaintiff experienced Crohn's flare-ups, including a ten-day hospitalization in February 2008. And Plaintiff's prior use of Remicade and abdominal surgeries indicate that his Crohn's disease was severe and difficult to treat. In sum, the Court concludes that the ALJ erred in finding that Plaintiff would not need to use the bathroom frequently or miss three days of work or more per month due to his combination of impairments. See *Dix,* 900 F.2d at 138 (finding claimant with Crohn's disease who had frequent flare ups and some periods without symptoms was not capable of working on a regular basis); *Becker v. Astrue,* 676 F.Supp.2d 813, 821–23 (S.D.Iowa 2009) (finding claimant's illness, including Crohn's disease, deprived her of substantial capacity and the ability for steady attendance).

## C. Past Relevant Work

 The Court finds that the ALJ erred in concluding that Plaintiff could perform his past relevant work. Plaintiff asserts the VE testified that a hypothetical person limited to unskilled work could not perform Plaintiff's past relevant work because it was semiskilled. The Court agrees. (Tr. 419–20, 26.)

The ALJ included a limitation for unskilled work in his RFC determination. (Tr. 26.) Therefore, the VE's testimony did not support the ALJ's determination that Plaintiff could perform his past relevant work. Based on Plaintiff's age and his RFC for unskilled work, he would be

disabled under the grids, had the ALJ concluded that Plaintiff could perform only light or sedentary work. The Medical Vocational Guidelines (the "Grid"), directs a conclusion of "disabled," if Plaintiff had the RFC for sedentary or light exertional work due to Plaintiff's age (advanced), education (high school or more), and work experience (semi-skilled) at the relevant time. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 2, §§ 201.06 and 202.06. Therefore, the Grid would direct a conclusion of disabled unless Plaintiff could perform at least medium exertional level work.

Defendant argues that whether the ALJ erred in finding Plaintiff capable of performing his past relevant work is irrelevant because the ALJ's decision that Plaintiff could perform other medium exertional level work was supported by substantial evidence. However, because the Court finds that the ALJ should have found Dr. Kleinschmidt's RFC opinion controlling, the Court rejects Defendant's argument, and addresses step five of the disability determination below.

### D. The Hypothetical Question Regarding Other Work

■ A hypothetical question posed to a vocational expert must relate with precision to all of the claimant's impairments. *Rappoport v. Sullivan,* 942 F.2d 1320, 1323 (8th Cir.1991). "Testimony from a [vocational expert] based on a properly-phrased hypothetical question constitutes substantial evidence." *Roe v. Chater,* 92 F.3d 672, 675 (8th Cir.1996).

■ Plaintiff asserts that the hypothetical question was inaccurate because it did not include Plaintiff's frequent use of the bathroom, and that Plaintiff's combined impairments would cause him to miss more than three days of work per month. The Court agrees.

When the ALJ posed a hypothetical question to the VE that was based on part of Dr. Kleinschmidt's opinion, including the need to use the bathroom ten or more times a day and work absences three or more times a month, the VE testified that such a person was not employable. (Tr. 420.) Furthermore, the ALJ noted that if he limited Plaintiff to light duty, unskilled work, and brief and superficial contact with others, it was presumptive of disability, if the claimant was older than 55 at the relevant time. (Tr. 421.) The lifting restriction imposed by Dr. Kleinschmidt, ten to fifteen pounds frequently, is consistent with light work and inconsistent with medium work. 20 C.F.R. § 404.1567(b) and (c); Social Security Ruling 83–10, 1983 WL 31251, at *5–6 (S.S.A.1983) (defining frequently). Thus, when Dr. Kleinschmidt's opinion is given controlling weight, the VE's testimony and the regulations support a finding that Plaintiff was disabled. The Court therefore grants Plaintiff's motion for summary judgment and remands the case for a calculation and award of benefits. *See Andler v. Chater,* 100 F.3d 1389, 1394 (8th Cir.1996) (if claimant is disabled on the record, court may reverse and remand for entry of order granting benefits).

### CONCLUSION

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED THAT:**

1. Plaintiff's Motion for Summary Judgment (Doc. No. 12), is **GRANTED;**

2. Defendant's Motion for Summary Judgment (Doc. No. 18), is **DENIED;**

3. The case is remanded pursuant to sentence four of 42 U.S.C. § 405(g), for calculation and award of benefits;

4. The case is dismissed.

**LET JUDGMENT BE ENTERED AC-CORDINGLY.**